NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the
# Supreme Court of Georgia

No. S26A0753
Zaiara Dantrice Smith
v.
The State

On Appeal from the Superior Court of Richmond County
No. 2021-RCCR-00245

Decided: June 30, 2026

LAGRUA, Justice.

Appellant Zaiara Dantrice Smith appeals his convictions for malice murder and other crimes related to the shooting death of Tobias Fleming.[1] On appeal, Smith argues that (1) the evidence was legally insufficient to support the verdict, and (2) the trial court abused its discretion by admitting body camera footage that showed a police officer attempting CPR on Fleming. For the

[1] Fleming was killed on August 15, 2020. On February 9, 2021, a Richmond County grand jury indicted Smith for the following counts: malice murder (Count 1); felony murder predicated on aggravated assault (Count 2); and possession of a firearm during the commission of a felony (Count 3). Smith was tried from August 7 to 9, 2023, and the jury found Smith guilty on all counts. The trial court sentenced Smith to life without the possibility of parole on Count 1, and five years to run consecutively on Count 3. The trial court purported to merge Count 2 into Count 1, but Count 2 was actually vacated by operation of law. See *Washington v. State*, 313 Ga. 771, 772–73 (2022). Smith filed a timely motion for new trial, which he later amended through new counsel on March 31, 2025. The trial court denied the motion on October 8, 2025. Smith filed a timely notice of appeal, and his case was docketed to this Court's April 2026 term and submitted for a decision on the briefs.

reasons set forth below, we reject Smith's arguments. Accordingly, we affirm.

The evidence presented at trial showed that, on the afternoon of August 15, 2020, Smith shot and killed Fleming in a parking lot outside of the apartment that Fleming shared with Smith's cousin, Tamika Smith. Earlier that day, several of Tamika's family members gathered at Fleming and Tamika's apartment, including Smith and Bobby Daniels. Smith, who was wearing a yellow shirt and jeans, arrived at the apartment that afternoon, driving his mother's burgundy Kia Optima. After Smith arrived, Tamika observed that his "emotions [were] up and down," and Smith told Tamika that she "needed to get these demons out of [her] house." Around this time, Daniels suggested that the men at the gathering go outside to get some fresh air. Smith, Daniels, and two other men then went outside to the parking lot, where they drank beers, did "a little rapping," and talked. The two other men eventually left, and Smith and Daniels remained in the parking lot.

Daniels went to urinate between two vehicles, and he heard gunshots. Daniels testified that he looked up and saw Smith running towards him and Fleming falling to the ground. Carol Knight, who lived in the same apartment complex as Tamika and Fleming, testified that, after hearing gunshots, she went to her window and looked outside. Knight saw a man wearing a yellow shirt and jeans walking towards a dumpster, and then she heard three more gunshots and saw the man get into a "maroon" car and leave. Knight did not see anyone else in the parking lot at that time. Tamika testified that she also heard gunshots, ran outside, and saw Daniels on the ground pointing towards the dumpster. Tamika saw Fleming near the dumpster and Smith leaving in a burgundy Kia Optima. In Daniels's

2

testimony, he also affirmed that he saw Smith leave in a "burgundy colored Kia." Tamika did not see anyone else in the car with Smith, and she did not see a gun in Daniels's hands.

Investigator Patrick Brown with the Richmond County Sheriff's Office responded to the scene, and on the way, his body camera began recording audio and video, which was played for the jury at trial. When Investigator Brown arrived, he saw Fleming's body[2] near a dumpster, a large crowd of bystanders surrounding Fleming, and several people attempting to render aid to him. Investigator Brown then began rendering aid, but due to the position of Fleming's head on the parking lot curb, he twice had to move Fleming's body so that he could administer CPR. When he moved Fleming the second time, Investigator Brown observed a bullet and a cell phone that had been underneath Fleming's head, and a Taurus .380-caliber handgun that was sticking out of Fleming's front pocket. Investigator Brown testified that he removed the Taurus handgun from Fleming's pocket, and that the handgun did not have a round in the chamber, did not appear to have been recently fired, and did not match the five cartridge casings that officers collected at the scene. After completing his CPR attempts on Fleming, Investigator Brown spoke to witnesses at the crime scene and called in a "be on the lookout" for Smith and a "burgundy Kia sedan."

Later the same day, officers located a burgundy Kia Optima, which was registered to Smith's mother, in a parking lot about a mile from the home of Smith's sister-in-law, Demetria Smith. After towing the vehicle to a different location to be "processed," investigators found a yellow shirt in the vehicle. That

---

[2] The medical examiner testified that Fleming's autopsy revealed two gunshot wounds to the head.

3

night, investigators went to Demetria's house, where, according to Demetria, Smith had unexpectedly shown up earlier that day. While some of the officers were knocking on the front door of the house, another officer went around to the backyard, where he saw Smith run out of the house and hide under a trampoline. Officers then arrested Smith and, after obtaining a search warrant, searched Demetria's house, but they did not find the firearm involved in the shooting of Fleming.

Two days later, Demetria went to the room where Smith had been staying shortly before his arrest to get some diapers for her daughter. Demetria noticed that one of the packages of diapers had already been opened, so she looked inside and found a Smith & Wesson 9mm handgun that did not belong to any of the people living in her house. Demetria's husband then contacted investigators, who returned to the house and seized the firearm. At trial, the firearms examiner testified that (1) the five cartridge casings collected at the scene of the shooting were fired from this firearm; and (2) the bullet collected at the scene was consistent with being fired from a Smith & Wesson 9mm handgun.

1. Smith first contends that the evidence in this case was insufficient as a matter of constitutional due process to support his convictions, see *Jackson v. Virginia*, 443 US 307, 319 (1979), and that the evidence was insufficient as a matter of Georgia statutory law under OCGA § 24-14-6. Both claims fail.

(a) When considering a claim that the evidence was not sufficient as a matter of constitutional due process, "we view the evidence presented at trial in the light most favorable to the verdicts and consider whether it was sufficient to authorize a rational trier of fact to find the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted." *Reid v. State*, 322 Ga. 858, 861 (2025) (citing *Jackson*, 443 US at 319).

4

"In doing so, we defer to the jury's resolution of any conflicts in the evidence, the credibility of witnesses, and the drawing of reasonable inferences from the facts." *Mack v. State*, 322 Ga. 390, 392 (2025) (quotation marks omitted). "The jury's verdicts will be upheld as long as some competent evidence, even if contradicted, supports each fact necessary to make out the State's case." *Sims v. State*, 321 Ga. 627, 629 (2025) (quotation marks omitted).

Here, the evidence was sufficient as a matter of constitutional due process to authorize the jury to find Smith guilty of the crimes for which he was convicted. Viewed in the light most favorable to the verdicts, the evidence presented at trial showed that, when Smith arrived at the family gathering on the day of the shooting, he was wearing a yellow shirt and jeans and driving his mother's burgundy Kia Optima. Later, when Daniels and Smith were outside in the parking lot, Daniels heard gunshots and then saw Fleming falling to the ground, Smith running towards Daniels, Smith getting into a "burgundy colored Kia," and Smith leaving. Knight testified that, after hearing gunshots, she looked outside her window and saw a man in a yellow shirt and jeans walk towards a dumpster, then she heard three more gunshots and saw the same man get into a "maroon" car and leave. Knight did not see anyone else in the parking lot at that time. When Tamika ran outside after hearing gunshots, she saw Daniels pointing towards the dumpster, and she did not see a gun in Daniels's hands. Tamika also saw Fleming near the dumpster and Smith leaving the parking lot by himself in a burgundy Kia Optima. Investigators later located a burgundy Kia Optima, which was registered to Smith's mother, in a parking lot near Demetria's home and found a yellow shirt inside. Additionally, when investigators went to Demetria's house later that night, Smith fled out of the back door and attempted to hide. A few days later, investigators recovered a Smith & Wesson 9mm

firearm that was hidden in Demetria's guestroom where Smith had been staying on the night of the shooting. The five cartridge casings collected at the scene of the shooting were fired from this Smith & Wesson 9mm firearm, and the bullet collected at the scene was consistent with being fired from a Smith & Wesson 9mm handgun.

Accordingly, when viewed in the light most favorable to the verdicts, the evidence presented at trial was sufficient as a matter of constitutional due process to authorize a rational jury to find Smith guilty beyond a reasonable doubt of the crimes for which he was convicted. See *Glenn v. State*, __ Ga. __ (2026), S26A0195, slip op. at 5–6 (Ga. June 16, 2026) (holding that the evidence was sufficient as a matter of constitutional due process to support the appellant's convictions for malice murder and other crimes where the appellant was observed after the shooting wearing a white shirt and driving a black Nissan, which matched witnesses' descriptions of the shooter, and the appellant fled when officers attempted to conduct a stop); *Patterson v. State*, 324 Ga. 6, 9 (2026) (concluding that the evidence was sufficient as a matter of constitutional due process to support the appellant's malice murder conviction where, among other things, witnesses testified that they heard gunshots then saw the appellant leave the crime scene).

(b) Turning to Smith's argument that the evidence was insufficient as a matter of Georgia statutory law, OCGA § 24-14-6 provides that, to support a conviction based on circumstantial evidence, "the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." But we have said that "[n]ot every hypothesis is a reasonable one, and the evidence need not exclude every *conceivable* inference or hypothesis, only

6

the reasonable ones." *Shellman v. State*, 318 Ga. 71, 76 (2024) (quotation marks omitted). "The questions whether any alternative hypotheses are reasonable and whether the circumstantial evidence excludes any such hypotheses are for the jury," and "we will not disturb the jury's findings on those questions unless they are insupportable as a matter of law." *Lee v. State*, 318 Ga. 412, 417 (2024) (quotation marks omitted).

As an initial matter, Smith does not identify any specific alternative hypothesis that the State failed to disprove. Instead, Smith argues that the only "connection between [him] and the crimes alleged is his presence with Mr. Daniels at the time the gunshots were heard."

Even assuming that the evidence presented at trial was wholly circumstantial and that OCGA § 24-14-6 thus applies, we conclude that the evidence recounted above authorized the jury to exclude the hypothesis that Smith was merely present at the scene of the shooting. Accordingly, we see no reason to disturb the jury's conclusion that Smith was guilty of the crimes for which he was convicted. See generally *Ealey v. State*, 322 Ga. 509, 516 (2025) (concluding that the evidence presented at trial, even if circumstantial, was sufficient under OCGA § 24-14-6, where the appellant argued, among other things, that "he was merely present near the crime scene before the shootings occurred"); *Weston v. State*, 320 Ga. 472, 474 (2024) (holding that the evidence was sufficient under OCGA § 24-14-6 where the appellant "failed to identify any specific alternative hypothesis that, in his estimation, the State failed to disprove").

2. Smith also argues that body camera footage showing Investigator Brown conducting CPR on Fleming should have been excluded under OCGA § 24-4-403 ("Rule 403") because it was gruesome and unduly prejudicial, and the trial court abused its

7

discretion by admitting it. For the reasons set forth below, this claim fails.

At trial, prior to opening statements, Smith objected under Rule 403 to the State presenting the CPR portion—which was about two minutes long—of Investigator Brown's body camera footage. The body camera footage, in its entirety, primarily showed Investigator Brown: driving to and arriving at the scene, approaching Fleming, and speaking to bystanders; returning to his vehicle to grab gloves; running back to Fleming, telling bystanders to step back from Fleming's body, and asking bystanders if they saw anything; moving Fleming's body then beginning to administer CPR on Fleming; telling a bystander who was standing on a cartridge casing near Fleming to back up; moving Fleming's body again, which revealed a bullet and cell phone that had been under Fleming's head, and then continuing to perform CPR on Fleming; stating that Fleming had "no ID on him" and removing a firearm from Fleming's pocket; and interviewing bystanders, including Tamika, who identified Smith as the suspect and said that Smith was wearing a "gold polo shirt and some blue jeans" and left in a burgundy Kia. When Smith made his objection prior to opening statements, he argued that the CPR portion of the body camera footage was unfairly prejudicial because it showed Investigator Brown "pumping [Fleming's] chest" with nobody talking in the background, and it was "gruesome" because it showed Fleming on the ground with "blood coming out of his head." The trial court overruled the objection, and Smith renewed his objection prior to the admission of the evidence at trial. The State subsequently played a little over nine minutes of the body camera footage for the jury, which showed the actions taken by Investigator Brown detailed above.

As we have explained, the admissibility of crime scene

video-recordings is generally governed by the following:

> OCGA § 24-4-401, which defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"; by OCGA § 24-4-402, which provides that "all relevant evidence shall be admissible, except as limited by constitutional requirements or as otherwise provided by law or by other rules"; and by [Rule 403].

*Robinson v. State*, 308 Ga. 543, 549 (2020) (cleaned up). Rule 403 provides that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." OCGA § 24-4-403. And, we have said that "[t]he exclusion of evidence under Rule 403 is an extraordinary remedy which should be used only sparingly." *Lewis v. State*, 323 Ga. 339, 344 (2025) (quotation marks omitted). As we have explained in reviewing a decision not to exclude evidence under Rule 403, "because the admission of evidence lies within the sound discretion of the trial court, we will not disturb a trial court's determination as to the admissibility of evidence absent a clear abuse of discretion." *Wyatt v. State,* 319 Ga. 658, 664 (2024) (cleaned up).

Applying the Rule 403 balancing test set forth above, we see no clear abuse of discretion in the trial court's admission of the CPR portion of the body camera footage. First, contrary to Smith's argument that the "probative value of the CPR portion … [was] only to suggest that CPR efforts were made and were unsuccessful," the CPR portion of the body camera footage was

9

also probative to show Fleming's location and condition when Investigator Brown arrived on the scene—including that Fleming was still breathing—and to show how Investigator Brown manipulated the scene when he had to move Fleming's body twice to administer CPR. Additionally, the CPR portion corroborated Investigator Brown's testimony that, after moving Fleming's body, he located a bullet and a cell phone that were under Fleming's head, and he removed a firearm from Fleming's pocket. See *Varner v. State*, 306 Ga. 726, 729 (2019) (concluding that body camera footage, which showed the victim's "blood pooling on the ground and flowing from his head and face," was relevant and probative to show, among other things, the crime scene and the victim's injuries, and to corroborate the officer's testimony). Thus, the CPR portion of the body camera footage had significant probative value.

Turning to the second part of the Rule 403 balancing test—whether this probative value was substantially outweighed by the danger of unfair prejudice—Smith argues that the CPR portion of the body camera footage was "gruesome," but he fails to show how this portion was unfairly prejudicial to him. As we have said, "photographic evidence that fairly and accurately depicts a body or crime scene and is offered for a relevant purpose is not generally inadmissible under Rule 403 merely because it is gruesome." *Robinson*, 308 Ga. at 551. And "[t]he same is true of crime scene videos." Id. See also *Favors v. State*, 305 Ga. 366, 369 (2019) (holding that the trial court did not abuse its discretion by admitting a photograph showing gunshot wounds to the victim's body, which was relevant to show "the nature and location of the victim's injuries, which corroborated the State's evidence of the circumstances of the killing," and noting that "photographs depicting the wounds suffered by a gunshot victim are of an inherently disturbing nature" (cleaned up)).

Smith contends that *Morgan v. State*, 307 Ga. 889 (2020), supports his argument that the probative value of the CPR portion of the body camera footage was substantially outweighed by the danger of unfair prejudice. But his arguments are unpersuasive. In *Morgan*, the Court held that the trial court erred by admitting four minutes of body camera footage showing an officer performing CPR on a small child, but we identified no abuse of discretion in the trial court's admission of the first portion of that footage, or the trial court's admission of a separate body camera video, which showed brief glimpses of two children's bodies and an officer in the background administering CPR on one of the children. See 307 Ga. at 895–97. Regarding the admissible footage, the Court concluded that "[t]he prejudice inherent in those recordings was not unfair, nor did it substantially outweigh the recordings' probative value in showing the crime scene, the cause of the children's deaths, [the defendant's] demeanor, and other factors pertinent to the State's theory of the case." Id. at 897.

Here, the CPR portion of the body camera footage was similar to the admissible portions of footage in *Morgan* in that it showed Fleming's injuries as well as the layout of the crime scene—which, as noted above, changed when Investigator Brown twice moved Fleming's body while conducting CPR.[3] Moreover, unlike the "emotionally charged content" in the inadmissible portion of the *Morgan* video, which showed an officer "futilely tr[ying] to pump life back into [a child's] tiny, naked body" for four

_____

[3] To the extent that Smith argues that the CPR portion of the body camera footage was cumulative of other evidence because "there were photos of the crime scene tendered into evidence," and the CPR portion therefore had "scant probative value," this argument fails. Although the State did admit photos of the crime scene, none of those photos showed Fleming's body at the scene.

minutes, *Morgan*, 307 Ga. at 897–98, the CPR portion here was much shorter, and it showed more than just the administration of CPR, including that Investigator Brown (1) told a bystander who was standing on a cartridge casing to back up; and (2) discovered a bullet and cell phone after moving Fleming's body the second time. As such, any unfair prejudice from the CPR portion here was marginal and did not substantially outweigh the probative value of the footage. *See Morgan*, 307 Ga. at 897.

Accordingly, because Smith has not shown that the probative value of the CPR portion of the body camera footage was substantially outweighed by the danger of unfair prejudice, he has failed to show that the trial court clearly abused its discretion by admitting the footage at trial. See *Robinson*, 308 Ga. at 550–51 (concluding that a portion of body camera footage, which showed the victim lying in a pool of blood and another person attempting to stop the victim's blood loss, was relevant to show the victim's location and condition immediately following the shooting and to corroborate witness testimony, and holding that, because the appellant did not show that the probative value of the footage was substantially outweighed by the danger of unfair prejudice, the trial court did not abuse its discretion by admitting the footage). Therefore, this enumeration fails.

*Judgment affirmed. All the Justices concur.*